Spencer, J.
There was much testimony of a conflicting character before the court and jury on the trial of this action ; but in the view I take of the case, and the principles upon which it should have been decided, much of this testimony was irrelevant, and immaterial to the issues. With due respect for the learned judge and counsel before and by whom this case was tried, I think that the principles and precedents that should govern maritime contracts, like a charter of a vessel, or the relations existing between and which control the action, service, and liability of a master and mariners upon a vessel at sea, were overlooked.
*256 The questions considered by the court below appear to have been as follows:
First. Did the telegram authorize Messrs. Metcalf & Duncan to charter this tug for the service, and to contract to furnish a pilot for her navigation on the proposed voyage ?
Second. And if the authority was sufficient, and the agreement was to furnish a pilot (instead of paying for the service of a pilot, as contended by defendant), did the contract have the effect of placing the tug in the possession and under the ■ control and management of the defendant to that degree that he became liable for the care and management and the safe navigation of the vessel in her contemplated voyage, and for any negligence, lack of skill or diligence on the part of the pilot so furnished, or on the part of the master and crew of the vessel during said voyage ?
.Third. Was the vessel lost by or through the want of skill or the negligence of the pilot in the performance of his duties as such, or of the master and crew, while acting under his management and control during the voyage.
Fourth. These questions being decided in the affirmative, what was the amount of plaintiff’s damages in the premises.
I think the telegram was sufficient to authorize Metcalf & Duncan to do in the premises all that the plaintiff claims they did do, and that their action bound the defendant. I think the words “send me small tug-boat” were most full and comprehensive, as authority to provide the same in any manner and upon the best terms possible, and their contract in the premises (whatever the same were) for tug-boat, steam-pump, engineer, and diver for this service were binding upon their principal.
I think the weight of the evidence, however, preponderates in favor of the version of the contract as *257 claimed by the defendant. The plaintiff is the only witness whose testimony tends to establish that the contract was to furnish a pilot, and his great interest in the result of the action raises a presumption against the absolute accuracy of his memory in regard to the specific words that were said or were used by Metcalf and Duncan in making the contract, especially when contradicted by the positive testimony of Mr: Duncan, who made the contract, and the witness George Gregory, who was present at the time the contract was made; and the testimony of these two is supported by that of the pilot, Cutler, in regard to what took place and was said when he (Cutler) was introduced to Duncan..
I think the court should have concluded from the testimony that the plaintiff was mistaken or forgetful of the specific terms of the contract about the pilot, and that in truth and fact Duncan, acting as the agent of defendant, only agreed to pay the expense or hire of the pilot for the voyage, and upon such a conclusion the court should have dismissed the complaint upon motion, and the refusal so to do was error. I think, also, that upon the charge and submission of the case to the jury, the jury should have found a verdict for the defendant. In finding for the plaintiff the jury not only disregarded the charge of the cou’t, but also found a verdict wholly unsupported by the evidence that was material in the case, and therefore the judgment should be reversed. But assuming that the court and jury were correct in their conclusion that defendant did contract with the plaintiff “ to furnish a coast pilot for the voyage,” and thereby incurred all the liabilities that wbuld ensue from the use of those words, yet, I hold as a conclusion of law that such a contract did not make him responsible for the care and management and safe navigation of the vessel on the said voyage, but that the said pilot was received and placed *258 upon said vessel, simply as a pilot at sea, to advise and direct the course of said vessel to her place of destination, subject to and under the genera] authority and command of her master, who was the superior officer of such pilot during the whole voyage, and upon whom (the master) devolved the responsibility of the general care and management of such vessel during her voyage. I hold that this pilot was only a mariner or subordinate officer, whose duty was to advise and direct the master in regard to the course the vessel should take, or in other words the navigation of the vessel from New York to the Deleware Breakwater. He was an assistant for that purpose, supposed to know the coast near to which their navigation lay, and to know the ports and harbors into which the vessel could be taken in case of storm or peril of any kind, and to know and be able to advise" and direct the best courses upon which to sail in order to accomplish the voyage in the most safe and expeditious manner. Yet he (the pilot) could give no order or direction that could be enforced, except such as was approved and executed by and through the superior and supreme authority of the master. The extreme limit of the responsibility of the defendant under this contract was that he should furnish a man that was a good coast pilot, one who possessed knowledge and experience in regard to the coast, the locality of the point to be reached, and the approaches thereto, to that degree that he was competent to advise the master, and, under his authority, 'direct the course or navigation of such vessel upon such voyage along the coast, and thus enable the master to safely navigate Ms vessel and make a voyage along, and to a point upon, a coast with which he and his other officers and mariners were unacquainted.
There are generally headlands, islands, shoals, currents, inlets, beacons, or harbors (as in this case), to be sought or avoided, in such a voyage, and which are *259 among the incidents of coast navigation, and a full knowledge of these the coast pilot is presumed to pos- „ sess. He is a pathfinder for the vessel upon such a voyage. He points -out and directs the best route and course to accomplish the voyage expeditiously and safely along the coast to the destined port.
There is no question in this case as to the competency of Cutler in these respects. In fact, the evidence fully establishes that he was a coast pilot of experience and ability, and I think the defendant furnished a coast pilot fully competent in .all respects, when he furnished Cutler as one.
There is no evidence of any lack of skill, nor negligence in the performance of his duties as a coast pilot on the part of Cutler, as I view this case. If there was negligence, lack of skill or judgment on his part, of any kind, it was in the performance of other duties than those of coast pilot, namely, in those of steersman, lookout, or mariner, which he was at the time (by the consent and direction of the master) performing on said boat.
I also hold that the court below erred in its ruling when it admitted testimony, objected to by defendant, of a usage or custom in regard to coast pilots having absolute and supreme control and management of a vessel on a voyage like this as thé superior of the master of said vessel.
Such control and management and the government and discipline of a vessel like this engaged on such a voyage should be determined as a question of law, and cannot be considered as a question of fact based upon custom or usage. This power and authority is clearly and unquestionably conferred upon and intrusted to the master of the vessel by the common, civil, and maritime law, and he (the master) must be held responsible for its use, non-use, or abuse, and he cannot evade that responsibility nor shift the same from *260 himself upon other persons by virtue of any custom or usage to the contrary.
Abbott on Shipping, at page 231, defines this law: “By the common law the master has authority over all the mariners on board the ship in all lawful matters relating to the navigation of the ship. Such authority is absolutely necessary for the safety of the ship and the lives of all persons on board.”
The late Judge Betts, who was distinguished for his learning and ability as a judge of maritime law, has expressed himself .in many cases to the same effect. In one he uses these words: “ The master of a vessel has complete authority in everything relating to the management and conduct of his vessel.”
See also opinion of Judge Ware (Butler v. McLellan, Ware, p. 222) : “The captain has all the authority of command on board the vessel, and the inferior officers, as well as the common seamen, are bound to obey his orders.”
The admiralty decisions favor only a single division of persons in charge of a ship, viz: that of “.master and mariners” or “master and crew.” “In cases of a lien upon a ship for wages under admiralty law, the pilot as also all other officers under the rank of master are deemed and classed as mariners, and hold their lien as such, which is prohibited to the master. He has no lien because he is the master, the agent and representative of the owners, in the performance of all his duties as master. In salvage and prize cases the pilot has been classed and considered as a mariner. In one of the oldest treaties upon maritime law, a copy of which is to be found in the appendix to second volume of Peters' Admiralty Pecisions, the power and responsibility of a master of a vessel are thus defined :
“ A master of a ship is one who for his knowledge in navigation and for his fidelity and discretion hath *261 the government of the ship committed to his care and management.”
“The law looks upon him as the officer who must render and give an account for the whole charge, when once committed to his care and custody, and if misfortunes happen through negligence, willfulness, or ignorance, of himself or his mariners, he must be responsible.”
“The master hath the supreme rule on shipboard.”
The duties of mariners are comprised in the words “Obedience to the lawful commands of the master.”
“ The mariners are under his correction and government, and know no other superior on shipboard but himself.”
■ The “ Laws of Oleron,” “ The Laws of Wisbwy,” “ The Laws of the Hanse Towns,” “ The Marine Ordinances of France or of Louis XIV.,” comprise the earliest sea laws codified, and are the basis of the present maritime law of this country, as also of other nations.
They recognize the office of pilot on board of a vessel for the voyage, and distinguish between his duties and those of a harbor or river pilot.
“The local pilots were called locmen,’ and were mariners hired at every river or harbor to assist the pilot of the vessel in guiding the course of the vessel into harbor or through a river or channel, so as to avoid shoals, rocks, &c., &c. If a vessel was lost by the false direction or ignorance of the local pilot, he was liable to lose hie head at the hands of the master or any of the mariners, who were authorized to cut it off, as a penalty for his false pretenses of knowledge or skill” {Laws of Oleron, arts. 13 and 14, and note of Qleirac to arts. I and 14).
“ The mastér shall chuse the ship’s, company and hire the pilots, mates, and mariners.”
“We enjoin all masters making long voyages, to *262 assemble every day at noon, or oftener if necessary, the mates and pilots and other expert persons, and to confer with them about the courses made and to be made” {Ordinances of France).
“ The master must understand the art of piloting and navigation, that he may know how to control the pilot; and mind how he steers the ship.”
“ In a merchantman the first officer is the master, the second the pilot (who enjoyed that place because in honor of the sciences he profest and practysed), the third the mate,” &e. (note to Art. 1, Laws of Oler or).
By the laws of Wisbuy, the master was obliged to hire a local pilot of a harbor, or river, or channel, when requested so to do by his own pilot and Ms mariners.
The first article of these last-named laws classifies the mate and pilot as mariners.
The second article provides that every pilot who does not understand his business shall repay the master the wages advanced to him, and half as much more as he had promised him.
The fifty-ninth article provides that when a ship is in or before a harbor or river with which her pilot (the ship’s pilot) is not well acquainted, the master ought to hire one at the place to carry his ship in.
The distinction between a harbor, river, or channel pilot and a pilot on board ship during the whole voyage is recognized and defined in Abb. on Shipp, p. 266, § 195, and several decisions are there quoted in the ■ notes, to the effect that the latter kind are properly mariners. I do not consider nor discuss this case as one affected by or connected with the rules that govern the management of a vessel when under the direction or subject to the duties of a licensed harbor or river pilot, on pilot grounds. This is not such a case. It is that of a pilot for a voyage, and governed by the general rules of law applicable to the relations of master and *263 pilot at sea or on a voyage, which, I hold, cannot be determined by usage or custom.
The master of the tug, in this instance, did not provide a proper watch nor lookout on board of his vessel. He placed the pilot in charge of the wheel, and he and the mate descended to the kitchen for their supper. He left no one upon the deck except the pilot, and he at the wheel. The pilot acting as wheelsman, without captain, mate, watch, or lookout, or any one within his call to aid him or advise with him in any emergency, was left exclusively to his own observation and judgment and action, in relation to any approaching vessel. He saw one that he concluded was a sailing vessel, headed toward the north-west, or to his starboard. He kept on his course instead of steering to the starboard, or crossing the bow of what he deemed a sailing vessel. This was right, according to his sight and judgment, in relation to the approaching vessel at the time. . His observation, judgment, and action were in fault, for the supposed sailing vessel proved to be a steamer, and he discovered his mistake too late to avoid the direful results of a collision. I hold that in such a case neither he,nor his employers should be held liable for his error of judgment, which depended upon his observation, and was not the result of carelessness, nor want of skill as a coast pilot.
First. As wheelsman or helmsman, in full and sole charge of the deck, he exercised his best judgment and skill and the greatest care and diligence, and was not guilty of any negligence of his duty as such, and he is not liable for the mistake in his observations.
Second. As wheelsman or helmsman he was the servant and agent of the plaintiff, and not of the defendant. He was not performing the duties of a coast pilot at the time.
Third. As coast pilot he was under and subject to the commands of the master of the tug, and he was *264 substantially the servant and agent of the plaintiff, and neither he nor his employer was liable to the plaintiff for any accident or damages, except those which could be directly traced to his ignorance of the coast or lack ' of knowledge and skill as a coast pilot, and neither he nor his employers were liable or responsible for the proper management of the vessel, for proper helmsman, lights, lookouts, watch, its speed, or any other matter pertaining to its goverment and discipline on the voyage.
The master was responsible for all these things, and if through any fault and negligence of his in the premises loss occurred, the plaintiff must bear the same.
Such a claim as this on the part of plaintiff cannot be sustained.
I hold that the master and his officers and mariners, including this coast pilot, were the agents and servants of the plaintiff. The master was the superior officer over the pilot; he was supreme in command upon that vessel. He was under no other obligation to heed- the advice or direction of the pilot nor to enforce the same, beyond the obligation that arose from his conviction of mind and judgment that the advice was good and that the direction was entitled to consideration and enforcement.
And it seems the parties understood their respective relations and acted thereupon, for the evidence tells us that the master consulted with the pilot about entering a harbor on the way down, and ascertained that Absecom harbor could be most conveniently reached. The pilot thought and advised that it was unnecessary to make a harbor; that it was proper and safe for the vessel to continue on its direct course at sea toward the Delaware Breakwater.
The master differed in opinion and judgment with the pilot, and commanded him to make Absecom harbor, and the pilot very properly obeyed the command or request of his superior officer.
*265 The coast pilot was overruled by the master, and submitted. The master was responsible for this deviation from their course and delay in their voyage ; and if upon the resumption of the voyage there was a lack of proper lights, lookouts, watches, or any other matters necessary for the proper and careful management and sailing of the vessel on her voyage, or an absence of necessary precautions against peril at sea, the exercise of which might have avoided this calamity, he is equally responsible, and he and his employers should not be relieved therefrom, and the consequences of a collision fall upon a coast pilot on board, who was his inferior officer, and engaged at the time in the performance of other duties than those of coast pilot, to which he had been assigned, or permitted to perfoim, by the master.
The judgment should be reversed, and a new trial ordered, with costs to abide the event.